IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHARONE FUQUAN GOODWIN, #191831,*
                                  *
    Plaintiff,               *
                                    *
vs.                            * CIVIL ACTION NO. 16-00252-WS-B
                                    *
ANTYWON MADISON, *et al.*,      *
                                    *
    Defendants.            *

## REPORT AND RECOMMENDATION

Plaintiff Sharone Fuquan Goodwin, an Alabama prison inmate who is proceeding *pro se* and *in forma pauperis*, filed a complaint seeking relief under 42 U.S.C. § 1983. (Doc. 1). This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R), and is now before the undersigned on Defendants Madison, Ezell, Watson, and Givens' Motion for Summary Judgment. (Docs. 43, 44). After careful consideration of Defendants' motion and supporting materials, Goodwin's response in opposition (Doc. 61), and other evidence of the parties, the undersigned recommends that Defendants' motion for summary judgment motion be **GRANTED.** More specifically, it is recommended that Goodwin's claims based on the disciplinary proceedings and deprivation of property be dismissed with prejudice, his claims based on the use of excessive force July 14, 2015 and July 23, 2015 be dismissed

1

with prejudice, and his claims based on the use of excessive force on June 11, 2015, August 14, 2015, and September 17, 2015 be dismissed without prejudice. It is further recommended that this action be **DISMISSED** in its entirety.

I.   <u>SUMMARY OF FACTUAL ALLEGATIONS</u>.

   **A. Complaint as Amended.**   (Docs. 1, 16).

Goodwin complains about disciplinary proceedings and incidents of excessive force that he alleges occurred from June 11, 2015 to September 17, 2015, and involved Correctional Officers Antywon Madison, Brian Ezell, and Jeremy Watson, and Assistant Warden Gwendolyn Givens.[1]  (Doc. 1 at 4-10).

According to Goodwin, on May 15, 2015, he was placed in protective custody because five inmates, associated with Defendant Madison, assaulted him.  (Doc. 1 at 4).  Goodwin

---

[1]   Goodwin's factual allegations are found in his original complaint on this Court's § 1983 complaint form (Doc. 1) and his self-styled amended complaint (Doc. 16), both of which are signed under penalty of perjury.  Being in this form, the complaint and amended complaint will be considered by the Court in ruling on the motion for summary judgment. <u>Perry v. Thompson</u>, 786 F.2d 1093, 1094 (11th Cir. 1986).  However, Goodwin's brief in opposition to Defendants' motion for summary judgment (Doc. 61) is not signed under penalty of perjury, nor is it an affidavit sworn to before a notary for its truthfulness.  Goodwin merely states that it is true and correct; thus, it cannot be considered by the Court on summary judgment.  (<u>See</u> <u>id.</u> at 10).  On the other hand, the affidavit of inmate Santonio Hicks, which is attached to Goodwin's response, is sworn to under penalty of perjury and will be considered by the Court.  (<u>See</u> <u>id.</u> at 18-19).

asserts that subsequent thereto, Defendant Madison, on June 11, 2015, kicked the back of his leg while escorting him from the Health Care Unit ("HCU").   (Id.).   When Goodwin confronted Madison about kicking him, Madison replied that he would "beat Petitioner[']s ass when they get on the elevator."   (Id. at 5). Goodwin asked to see the shift commander, at which point Madison tripped him, straddled him, and began choking him by digging into his windpipe.   (Id.).

Officers Owens and Sergeant Fountain came upon them and observed Madison on top of Goodwin, choking him even though Goodwin's hands were handcuffed behind his back.   (Id.).   They pulled Madison off him, and proceeded to take him to the HCU, where Goodwin was treated for bruises around the neck.   (Id.). A body chart was also completed.   (Id.).

Goodwin was subsequently charged with a disciplinary violation and found guilty of failure to obey Madison's order to get on the elevator.   (Id.).   Goodwin contends that following the July disciplinary, Defendants Madison, Ezell, and Watson began a campaign of assaults and harassment against him, which included falsifying disciplinaries and holding disciplinary hearings in his absence.   (Id. at 6; Doc. 16 at 4).

Goodwin contends that on July 14, 2015, while he was standing at his tray door, Ezell sprayed pepper gas on his

3

"privates" and face with no provocation.  (Doc. 1 at 6).  Next, on July 23, 2015, Ezell again sprayed Goodwin with pepper gas even though Ezell, as well as Defendant Madison, were aware that Goodwin suffers from asthma.  (Id.).  Additionally, Madison and Ezell threatened to kill him.  (Id.).  On August 14, 2015, during the dinner meal, Madison intentionally poured juice on Goodwin's floor.  (Id.).  When Goodwin protested, Madison sprayed him with pepper gas while Ezell closed the tray door to cut off ventilation.  (Id.).

Goodwin also alleges that on September 16, 2015, after he finished his ten-day hunger strike in a crisis cell, Watson escorted him to his assigned cell, and Goodwin noticed that his personal property was not in the cell.  (Id.; Doc. 16 at 5).  Goodwin asked Watson to check on his personal property and also wrote to Givens about his missing property.  (Doc. 1 at 6; Doc. 16 at 5).  The next day, Ezell came to Goodwin's door and while he was explaining about the missing property, Madison suddenly appeared and sprayed Goodwin in the face with pepper gas.  (Doc. 1 at 7, Doc. 16 at 5).  Ezell then proceeded to spray Goodwin, while Watson began closing the tray door with Goodwin's arm in it.  (Doc. 1 at 7).  Goodwin contends this occurred even though the warden had placed a sign above Goodwin's door stating that his tray door was only to be opened by a supervisor.  (Id.).

4

Goodwin contends the sign was designed to stop the assaults on him. (Id.). He also contends that pictures were taken of his injuries, a body chart made, and that he executed an affidavit about the use of force. (Doc. 16 at 5).

Goodwin asserts that Defendants Madison, Ezell, and Watson also harassed him by falsifying disciplinaries, and held hearings in his absence, and that Warden Givens knew of the harassment because five disciplinaries crossed her desk during the June to September 2015 period, namely HCF-15-00952-1, HCF-15-01085-1, HCF-15-00748-1, HCF-15-01244-1, and HCF-15-01244-2. (Doc. 1 at 6; Doc. 16 at 4). For instance, Goodwin asserts that Watson conducted the disciplinary hearing following the June 11 incident involving Madison, and that at the hearing, two witnesses testified that they pulled Madison off of Goodwin at the ramp (which is not near the elevator), but Goodwin was found guilty. (Doc. 1 at 5). Givens reviewed and upheld the disciplinary although the witnesses' statements, Goodwin's questions, and the witness list had all been lost.[2] (Doc. 1 at 5; Doc. 16 at 3). When Goodwin mentioned to Givens that she had approved the disciplinary even though the witness statements were missing, she responded: "Sue me." (Doc. 1 at 6, Doc. 16 at

---

[2]    Goodwin received a disciplinary sentence of twenty days in disciplinary segregation and his privileges were suspended for twenty days. (Doc. 16 at 3).

4).

Goodwin asserts that Givens' approval of the disciplinary and sentence violated Administrative Regulation 403C(2)(a), which provides that the warden has ten working days to rule on the disciplinary. (Doc. 1 at 5; Doc. 16 at 4). He further contends that Watson "falsified" the disciplinary hearing date for his alleged failure to obey Madison on June 11, 2015 to reflect "July 2nd" in order to comply with the ten-day due process requirement. (Doc. 1 at 10).

In addition, Goodwin claims that Watson falsified a disciplinary hearing date for failure to obey Ezell's order on September 17, 2015 to comply with the ten-day due process requirement. (Id.). Goodwin asserts that when the disciplinary was rejected due to the ten-day period having expired, Watson reinitiated the grievance even though no hearing had taken place. (Id.). Goodwin also contends that Watson should not have been the hearing officer because he was present during the assault. (Id.).

According to Goodwin, Givens approved four additional disciplinaries even though he informed her that he did not have a hearing and that the disciplinaries were altered because they reflected the same incidents but with different locations, dates, and statements. (Doc. 16 at 5). Goodwin further

6

contends that HCF-15-01222-1, HCF-15-01232-1, and HCF-15-01249-1[3] all reflect that a hearing was held on September 29, 2015; however, that is impossible because the arresting officer was out until October 12, 2015, according to the notice of postponement served by Officer Lett. (Id.). Goodwin contends that he notified Givens of this in an October 7, 2015 request slip. (Id.). However, she failed to investigate, and this, in turn, resulted in him receiving a sentence of nine months in disciplinary segregation and loss of privileges, which he served in a cell with no lights or working toilet. (Id.).

For relief, Goodwin seeks a declaratory judgment finding that Defendants Madison, Ezell, Watson and Givens violated his rights under the Eighth and Fourteenth Amendments, and that he be awarded $10,000 in punitive damages and $10,000 in compensatory damages from each Defendant for his pain, suffering, and mental anguish. (Doc. 1 at 11).

**B.  Defendants' Answer and Special Report.**  (Docs. 43, 44).

Defendants filed an answer denying the allegations against them and a special report in support of their position. (Docs. 43, 44). In an Order dated October 10, 2017, the Court converted Defendants' Answer and Special Report into a Motion for Summary Judgment, explained to the parties the procedure

---

[3]   Goodwin mentioned four disciplinaries but then listed numbers for three disciplinaries.

under Federal Rule of Civil Procedure 56, and afforded the parties an opportunity to submit additional information or evidence in support of or in opposition to the motion. (Doc. 49). The Court also directed Goodwin to notify the Court if he desired to continue with this litigation. (Id. at 4). Goodwin confirmed his desire to continue with the litigation and filed requests for the appointment of counsel and for documents. (Docs. 50, 54, 57, 75). Upon consideration, the Court denied Goodwin's requests for counsel and granted, in part, his request for documents. (Docs. 58, 66, 81). Goodwin filed a brief in opposition to Defendants' converted summary judgment motion.[4] (Doc. 61). Following a careful review of the parties' pleadings, Defendants' motion for summary judgment, and supporting materials, the court determines the motion is ripe for consideration.

## II.  **SUMMARY JUDGMENT STANDARD**.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir.

---

[4]  As noted *supra*, Goodwin's brief was not signed under penalty of perjury.

8

2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'" (citation omitted) (emphasis in original).

> The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.
>
> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. 2013) (citations omitted).

As noted supra, in considering whether Defendants are entitled to summary judgment in this action, the Court views the facts in the light most favorable to Goodwin. See Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001) ("We

view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.") (citation omitted).

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment.

Garczynski, 573 F.3d at 1165 (citations omitted).

Moreover, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. 2011) (unpublished) (same)).[5]

Additionally, the undersigned recognizes that while the Court is required to liberally construe a *pro se* litigant's pleadings, the court does not have "license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." GJR Invs., Inc. v. Cnty. of Escambia, Fla., 132 F.3d 1359, 1369 (11th Cir. 1998)

---

[5]   "Unpublished opinions are not considered binding precedent but may be cited as persuasive authority." 11th Cir. R. 36-2.

(citations omitted), <u>overruled on other grounds as recognized by</u> <u>Randall v. Scott</u>, 610 F.3d 701, 709 (11th Cir. 2010); <u>see</u> <u>Giles</u> <u>v. Wal-Mart Distribution Ctr.</u>, 359 F. App'x 91, 93 (11th Cir.) (unpublished) (same), <u>cert. denied</u>, 561 U.S. 1006 (2010).

**III. <u>Analysis</u>.**

**A. Disciplinary Claims.**

Goodwin identifies the disciplinaries listed below as the bases for numerous claims:

<u>HCF-15-00748-1</u>.  On June 11, 2015, Goodwin was charged with failure to obey a direct order of an ADOC employee, the disciplinary was approved, and Goodwin received a twenty-day loss of privileges and twenty days in disciplinary segregation.  (Doc. 44-13 at 14-21).

<u>HCF-15-00952-1</u>.  On July 14, 2015, Goodwin was charged with failure to obey a direct order of an ADOC employee.  The disciplinary was rejected as not being within the timeframe.  (Doc. 44-13 at 7-9).

<u>HCF-15-01085-1</u>.  On August 14, 2015, Goodwin was charged with assault on a person associated with ADOC. The disciplinary was rejected as not being within the timeframe. (Doc. 44-13 at 10-13).

<u>HCF-15-01244-1</u>.  On September 17, 2015, Goodwin was charged with assault on a person associated with ADOC, the disciplinary was approved by Terry Raybon, and Goodwin received a forty-five-day loss of privileges commencing on March 30, 2016 and forty-five days in disciplinary segregation.  (Doc. 44-13 at 23-26).

<u>HCF-15-01244-2</u>.  On September 17, 2015, Goodwin was charged with failure to obey a direct order of an ADOC employee.  He was found not guilty because the hearing was not held within the timeframe, which was approved by Defendant Givens.  (Doc. 44-23 at 28-30).

In addition to these disciplinaries, Goodwin mentions that he received four more disciplinaries; however, he only lists three disciplinaries, namely HCF-15-1222-1, HCF-15-01232-1, HCF-15-01249-1. (Doc. 16 at 5). Defendant Givens was the reviewing official in each of the three referenced disciplinary reports, to-wit:

> HCF-15-01222-1. On September 9, 2015, Goodwin was charged with failure to obey a direct order of an ADOC employee. He was found guilty and received forty-five days in segregation and a sixty-day loss of privileges commencing on December 16, 2015. (Doc. 44-13 at 34-37).

> HCF-15-01232-1. On September 10, 2015, Goodwin was charged with intentionally creating a security, safety, or health hazard. He was found guilty and received thirty days in segregation and a forty-five-day loss of privileges commencing on February 14, 2016. (Doc. 44-13 at 38-42).

> HCF-15-01249-1. On September 16, 2015, Goodwin was charged with making a threat, and he was found guilty and received forty-five days in segregation and a sixty-day loss of privileges commencing on October 17, 2015. (Doc. 44-13 at 43-46).

Contrary to Goodwin's contentions, none of these disciplinary reports reflect that he received nine months in disciplinary segregation. (See Doc. 16 at 5).

In order to state a § 1983 claim, a plaintiff must show a violation of his rights under the Constitution or laws of the United States by a person acting under color of state law. Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992).

12

Generally, correctional officials by virtue of their employment with the Alabama Department of Corrections act under color of state law, and none of the parties contest that at all times relevant to this lawsuit, Defendants were acting under color of state law.  Thus, one of the required elements for a § 1983 claim is satisfied.  To satisfy the other element, a plaintiff must demonstrate a violation of his constitutional or federal rights by a state actor.

To show a violation of a constitutional right in the disciplinary context, a plaintiff must demonstrate that he has a liberty interest to which due process attaches and that he did not receive the due process required to deprive him of his liberty interest.  Sandin v. Conner, 515 U.S. 472, 482-83 (1995).  The Sandin Court required an inmate to show the existence of a liberty interest and that he sustained a "grievous loss" by the deprivation of the liberty interest.  Id. at 480.  The Sandin Court held that an inmate's discipline only violates the Constitution when it is so severe that it "exceed[s] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force," or when an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life" is imposed.  Id. at 484, 486.  When such a liberty interest is at stake, the inmate

13

must receive due process in order to safeguard the liberty interest. Wilkinson v. Austin, 545 U.S. 209, 213, 224 (2005).

In Sandin, the Court concluded that the inmate did not suffer an atypical and significant hardship when he was confined to disciplinary segregation for thirty days, because his confinement "did not work a major disruption in his environment[,]" nor was it "a dramatic departure from the basic conditions of [his] sentence." Sandin, 515 U.S. at 485-86. The Court further observed that other inmates in general population also experienced lockdown in significant amounts of time, that the degree of the plaintiff's confinement in comparison did not exceed others' confinement, and that confinement to segregation "falls within the expected perimeters of the sentence imposed by a court of law." Id. at 485-86. Thus, the Court concluded that no liberty interest entitling the inmate to due process protections had been created, as "[t]he regime to which he was subjected as a result of the misconduct hearing was within the range of confinement to be normally expected for one serving [his sentence]." Id. at 487; cf. Wilkinson, 545 U.S. at 213, 224 (applying Sandin's reasoning to find that Ohio inmates had a liberty interest to avoid placement in the "Supermax" prison because the conditions taken together imposed an atypical and significant hardship). As a consequence, the inmate in Sandin

14

was not entitled to due process because he had not been deprived of a liberty interest. Sandin, 515 U.S. at 487. Because the Sandin plaintiff had no liberty interest in avoiding disciplinary segregation, the errors in the state's disciplinary process that occurred in his disciplinary proceedings did not give rise to a due process violation that could be addressed under § 1983. Id. at 476-77, 487.

In the present action, Goodwin must demonstrate that he suffered a grievous loss in order to establish a liberty interest to which due process attaches. Courts have recognized that an inmate may sustain a grievous loss when an "atypical and significant hardship [is imposed] on the inmate in relation to the ordinary incidents of prison life." Id. at 484. This loss generally arises from the conditions of confinement or the duration or degree of restriction of the disciplinary or administrative confinement. Id. at 486. Goodwin's allegations directed to a grievous loss are few. According to Goodwin, prior to the June 11, 2015 disciplinary charge, he was housed in protective custody. (Doc. 1 at 4). He was then transferred to disciplinary segregation to serve his disciplinary sentence. (Id.). Goodwin contends that he served over a year in disciplinary segregation. (Doc. 16 at 2). Later, in the same document, Goodwin asserts that he was sentenced to nine months

15

in disciplinary segregation (with no lights or working toilet) and loss of privileges for nine months. (Id. at 5). However, the disciplinary reports before the Court do not reflect any disciplinary sentence of nine months or of one year, and Goodwin has not produced anything to controvert these documents. (Doc. 44-13). Rather, the disciplinary reports show that Goodwin received disciplinary sentences ranging from twenty days to sixty days and that, cumulatively, Goodwin spent approximately 185 days (about six months), during intermittent periods, in disciplinary segregation. Moreover, the reports reflect that the types of disciplinary custody varied. For example, Goodwin was placed in a cell for observation in September 2015, during which his property was taken from his regular cell. (Doc. 61 at 12). And, on September 17, 2015, he was escorted from the crisis cell to his regular cell when he came off a ten-day hunger strike. (Doc. 1 at 6).

Courts have generally not found the varying periods of time to which Goodwin was confined to disciplinary segregation to be an atypical, significant hardship creating a liberty interest to which due process attaches. Compare Moulds v. Bullard, 345 F. App'x 387, 396 (11th Cir. 2009) ("Moulds I") (finding 201 days in Alabama's disciplinary segregation did not give rise to a protected liberty interest); Al-Amin v. Donald, 165 F. App'x

16

733, 739 (11th Cir. 2006) (finding that thirty months' confinement to administrative segregation did not constitute an atypical and significant hardship that would give rise to a liberty interest); Lekas v. Briley, 405 F.3d 602, 611 (7th Cir. 2005) (finding that ninety-day confinement to disciplinary segregation was not an atypical and significant hardship); Rodgers v. Singletary, 142 F.3d 1252, 1252-53 (11th Cir. 1998) (finding the plaintiff was not deprived of a constitutionally protected liberty interest by his placement in administrative segregation for two months); Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999) (finding that a 101-day administrative confinement was not an atypical and significant hardship); Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997) (finding that confinement to administrative segregation for six months did not implicate a liberty interest); Morefield v. Smith, 404 F. App'x 443, 446 (11th Cir. 2010) (finding that a four-year confinement in administrative segregation, although lengthy, did not create a liberty interest considering that the conditions of confinement were similar to those in the general population), with Williams v. Fountain, 77 F.3d 372, 374 n.3 (11th Cir.) (assuming that one year in solitary confinement presented an atypical and significant hardship which resulted in a deprivation of a liberty interest), cert. denied, 519 U.S. 952

17

(1996); Magluta v. Samples, 375 F.3d 1269, 1282 (11th Cir. 2004) (holding the harsh conditions in solitary confinement under which plaintiff was held for 500 days amounted to an atypical and significant hardship to which due process attached). Accordingly, the Court finds that Goodwin's confinement to disciplinary segregation on each disciplinary sentence did not give rise to a liberty interest protected by the due process clause, nor has the overall number of days in disciplinary segregation been shown to give rise to a liberty interest.

In addition to confinement to disciplinary segregation, Goodwin's disciplinary sentences included the loss of privileges (canteen, telephone, and visitation) for varying durations, none of which exceeded sixty days individually, and collectively the loss was not more than 230 days. An inmate's ability to visit, to shop, and to use the telephone is heavily restricted while in prison, as are most aspects of an inmate's life. See Sandin, 515 U.S. at 485. The further restriction of these privileges for short periods of time is a less severe punishment than confinement to disciplinary segregation. The restriction of privileges is not "atypical," nor is it a "significant hardship" under the Sandin analysis, and it is a type of discipline that should be expected by a prisoner as an incident to his criminal sentence. See id. at 487. As pled by Goodwin, the deprivation

18

of these privileges does not give rise to a liberty interest that is protected by due process. See Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989) (finding an inmates did not have a protected interest in visitation arising from the Due Process Clause); Overton v. Bazzetta, 539 U.S. 126, 131, 134 (2003) (upholding a regulation that permitted a two-year restriction on visitation privileges for two substance abuse violations because prison confinement requires the surrendering of liberties and privileges enjoyed by other citizens, with free association being among the rights least compatible with prison confinement); Charriez v. Sec'y, Fla. Dep't of Corr., 596 F. App'x 890, 894 (11th Cir. 2015) (finding that the one-year loss of visitation privileges did not implicate a liberty interest); Moore v. Pemberton, 110 F.3d 22, 23 (7th Cir. 1997) (finding no loss of a liberty or property interest when prisoner received as part of his disciplinary punishment a two-week loss of commissary privileges); Walker v. Loman, 2006 WL 3327663, at *1-3 (M.D. Ala. Nov. 15, 2006) (holding the ninety-day loss of store, telephone, and visitation privileges, recommended custody classification increase, and referral for possible free-world prosecution did not result in the deprivation of a liberty interest). Moreover, Alabama courts have determined that a prisoner does not have a state-created liberty interest in

19

store, telephone, and visitation privileges.  <u>See</u> <u>Dumas v.</u> <u>State</u>, 675 So. 2d 87, 88-89 (Ala. Crim. App. 1995).

In the present action, Goodwin has not proffered allegations demonstrating a right arising from the Constitution's Due Process Clause itself or a liberty interest created by state law.  Thus, his claims based on his disciplinary sentences must fail.  Goodwin's assertions that his due process rights were violated because the disciplinary hearings were sometimes not held within ten days after the charge, the disciplinary was not approved within ten days after the verdict, the hearing officer was involved in the underlying incident, or the disciplinary was false are of no moment because, in the absence of a liberty interest, Goodwin was not entitled to due process in connection with the complained of disciplinary hearings.[6]

---

[6]    Of course, if an inmate demonstrates the existence of a liberty interest, the inmate must receive the process set out in <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974).  "Under <u>Wolff</u>, a prisoner facing a disciplinary hearing that may result in the loss of a liberty interest must receive: (1) advance written notice of the charges against them; (2) an opportunity for the inmate to call witnesses and present documentary evidence, so long as doing so is consistent with institutional safety and correctional goals; and (3) a written statement by the factfinder outlining the evidence relied on and the reasons for the disciplinary action."  <u>Moulds v. Bullard</u>, 452 F. App'x 851, 854 (11th Cir. 2011) ("<u>Moulds II</u>").  A prisoner, however, does not have a "constitutional right to an administrative appeal from a disciplinary proceeding."  <u>Moulds I</u>, 345 F. App'x at 389 n.1.  Furthermore, "not every violation by a state agency of its

own rules rises to the level of a due process infringement" as the "two analyses are separate." Smith v. Georgia, 684 F.2d 729, 732 n.6 (11th Cir. 1982); see ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1229 (11th Cir. 2009) (same), cert. denied, 558 U.S. 1023 (2009). Accordingly, claims based on administrative regulations being violated that do not relate to Wolff's mandates would not demonstrate a violation of the Constitution.

Further, claims for false disciplinary charges and for false disciplinaries are not recognized when there is no liberty interest. See Sandin, 515 U.S. at 476, 487 (holding the inmate had no liberty interest to which due process attached even though approximately nine months after he served his thirty-day disciplinary sentence the deputy administrator expunged his disciplinary because he found the disciplinary unsupported); Leslie v. Doyle, 125 F.3d 1132 (7th Cir. 1997) (holding the inmate's due process rights were not violated when the disciplinary board agreed with him that the charges against him were false even though he had already served his segregation time); Spellmon v. Price, 100 F.3d 953 (5th Cir. 1996) (affirming the dismissal of claim for a false disciplinary as frivolous based on Sandin, as no liberty interest was present); Rodgers, 142 F.3d at 1252-53 (11th Cir. 1998) (affirming the dismissal of an action for failure to show an interest protected by due process arising from an inmate being held in administrative segregation for two months while facing pending criminal charges, after his "false" disciplinary had been dismissed because it was not heard within the regulation's seven-day period); Simpkins v. Gulf CI Warden, 2017 U.S. App. LEXIS 27316, at *1-2, *7-8, 2017 WL 6034508, at *1, *3 (11th Cir. Apr. 21, 2017) (finding the inmate did not have an interest protected by due process even after his disciplinary conviction was overturned on appeal for technical errors after he had been found guilty on a rewritten and reprocessed disciplinary report and confined to disciplinary segregation for thirty days); Halliburton v. O'Bryan, 2015 U.S. Dist. LEXIS 123646, at *1, *4-6, 2015 WL 5468670, at *1-3 (N.D. Fla. May 12, 2015) (finding an inmate did not have protected liberty interest when he was found guilty and received a disciplinary sentence of sixty days on an allegedly false disciplinary charge).

In addition, Goodwin claims that Defendant Watson improperly served as the hearing officer in HCF-15-01244-2 (see Doc. 44-13 at 28-30; Doc. 1 at 10; Doc. 16 at 6), because he was involved in the underlying incident by closing Goodwin's tray door after Ezell and Madison had sprayed him with pepper gas.

21

**B. Deprivation of Property Claim.**

In his complaint, Goodwin alleges that on September 16, 2015, after he finished his ten-day hunger strike in a crisis cell, Defendant Watson escorted him to his assigned cell, which no longer contained his personal property. (Doc. 1 at 6; Doc. 16 at 5). He asked Defendant Watson to check on his property (Doc. 1 at 6) and wrote to Defendant Givens about his property loss. (Doc. 16 at 5). He also spoke to Defendant Ezell about his missing property. (Doc. 1 at 7; Doc. 16 at 5).

In order to state a claim under § 1983 against a state official, a plaintiff must demonstrate that the state official's conduct deprived him of "rights, privileges, or immunities secured by the Constitution or laws of the United States." Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330-31 (1986). In this instance, the applicable constitutional provision is the Fourteenth Amendment, which protects against deprivations of

---

(See Doc. 1 at 7). However, the report reflects that Watson actually rendered a not guilty finding in HCF-15-01244-2 because the hearing was not held within ten working days from when Goodwin was served. (Doc. 44-13 at 29). This finding was upheld by Defendant Givens. (Id.). In accordance with the above reasoning concerning false disciplinaries, if a hearing officer was involved in or a witness to the events leading to the disciplinary but found the inmate not guilty, no violation of the Constitution has occurred. That is particularly true here where no underlying liberty interest is involved.

life, liberty, or property by a State without due process of
law.  Parratt, 451 U.S. at 537.  However, "[n]othing in [the
Fourteenth Amendment] protects against all deprivations of life,
liberty, or property by the State.  The Fourteenth Amendment
protects only against deprivations without due process of law."
Id. (citation and internal quotation marks omitted).

A deprivation of property that is the result of a state
employee's negligence or lack of due care does not violate the
Fourteenth Amendment.  Daniels v. Williams, 474 U.S. 327, 333
(1986).  And, "an unauthorized intentional deprivation of
property by a state employee does not constitute a violation of
the procedural requirements of the Due Process Clause of the
Fourteenth Amendment if a meaningful postdeprivation remedy for
the loss is available."  Hudson v. Palmer, 468 U.S. 517, 532
(1984).  When a pre-deprivation hearing is "impracticable" due
to the "random and unauthorized conduct of a state employee," an
adequate post-deprivation remedy satisfies due process because
it is impossible for the State to know beforehand of the
deprivation.  Id.  Some post-deprivation remedies that have been
found to satisfy due process are administrative procedures, see
Parratt, 451 U.S. at 543-44, or ordinary state tort litigation
procedures, see Hudson, 468 U.S. at 535.

In the present action, Goodwin does not identify who took

23

his property.  He merely identifies the officers whom he asked to check on his property upon discovering that it was missing. (Doc. 1 at 6-7; Doc. 16 at 5).  The fact that their efforts to find and return his property were not successful is not of constitutional magnitude.

With respect to the unidentified state official(s) or other person(s) who took his property, Goodwin does not provide any information.  Regardless of whether the deprivation of property occurred as a result of intentional or negligent conduct, no constitutional claim has been stated.  See Daniels, *supra*; Hudson, *supra*.  Due to the paucity of information, the Court can only conclude that the deprivation was a random and unauthorized act for which a pre-deprivation hearing was impracticable. Therefore, in order for this deprivation to be reviewable in this Court, Goodwin must demonstrate that no adequate post-deprivation procedure was available to him at the time of the deprivation.  See Tinney v. Shores, 77 F.3d 378, 382 n.1 (11th Cir. 1996) (finding that no due process claim was stated because the plaintiffs did not address the unavailability of an adequate post-deprivation remedy); cf. Moore v. McLaughlin, 569 F. App'x 656, 658 (11th Cir. 2014) ("The state's action is not complete 'until and unless it provides or refuses to provide a suitable postdeprivation remedy.'") (citation omitted).

24

In Goodwin's complaint, as amended (Docs. 1, 16), he does not refer to a post-deprivation procedure, much less discuss the availability and adequacy of any such procedure. His deprivation-of-property claim cannot proceed because Goodwin has not and cannot show that an adequate post-deprivation remedy was not available at the time of the deprivation. Courts have recognized that Alabama law provides adequate post-deprivation remedies for the loss of property by state officials. Dawson v. City of Montgomery, 2008 U.S. Dist. LEXIS 19833, at *23, 2008 WL 659800, at *8 (M.D. Ala. Mar. 6, 2008) (finding that Alabama's conversion statute, Alabama Code § 6-5-260 (1975), is an adequate post-deprivation remedy); Browning v. City of Wedowee, Ala., 883 F. Supp. 618, 623 (M.D. Ala. 1995) (finding that the taking of property by the sheriff and deputies may be addressed in tort pursuant to Alabama Code § 6-5-260 or by filing a claim with the Alabama Board of Adjustment pursuant to Alabama Code §§ 41-9-60, *et seq*.); Milton v. Espey, 356 So. 2d 1201, 1203 (Ala. 1978) (finding that a state employee may be personally liable in an ordinary, state-court tort action).

The post-deprivation remedy does not need to be available to Goodwin at the present time to determine whether the deprivation was with or without due process. See Parratt, 451 U.S. at 543-44. It is only required that an adequate post-

deprivation remedy be available when the deprivation occurred. Id. Because an adequate post-deprivation remedy was available at the time of the deprivation, the deprivation of Goodwin's property was not without due process. Accordingly, Goodwin's § 1983 claim for a deprivation of his property without due process of law is frivolous and is due to be dismissed with prejudice. See Jackson v. Hill, 569 F. App'x 697, 698 (11th Cir. 2014) (affirming dismissal of a prisoner's deprivation-of-property claim as frivolous when the prisoner had available an adequate post-deprivation remedy under state law).

### C. Excessive Force Claims.

#### 1. Applicable Law.

The Court turns next to Goodwin's claims for excessive force. The Eighth Amendment's prohibition against "cruel and unusual punishments" governs claims for use of excessive by prison officials. Hudson v. McMillian, 503 U.S. 1, 4 (1992). To determine whether excessive force was used, courts look to whether there has been an "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319 (1986).

An Eighth Amendment violation requires that objective and subjective components be established. Hudson, 503 U.S. at 8. The objective component "excludes from constitutional recognition de minimis uses of physical force, provided that the

26

use of force is not of a sort 'repugnant to the conscience of mankind.'" Id. at 9-10 (quoting Whitley, 475 U.S. at 327). That is, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9 (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")). On the other hand, a significant injury need not be sustained in order to state an Eighth Amendment violation. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (recognizing that the quantum of injury sustained does not determine whether a claim is stated but may be relevant to determining the amount of force applied or whether the use of force was necessary).

The subjective component requires a showing that the use of force was applied "'maliciously and sadistically for the very purpose of causing harm.'" Hudson, 503 U.S. at 6 (quoting Whitley, 475 U.S. at 320-321). To make this determination, courts use the following factors to decide whether the force used violated the Constitution:

> a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response.

Fennel v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009).

27

The core inquiry is "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Wilkins, 559 U.S. at 37 (quoting Hudson, 503 U.S. at 7). "[C]orrections officers must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates[,] . . . which may require prison officials to act quickly and decisively." Hudson, 503 U.S. at 6. Thus, "[t]he existence of 'a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives' is not enough to support a claim of excessive force in an institutional setting." Scroggins v. Davis, 346 F. App'x 504, 505 (11th Cir. 2009) (quoting Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999)), cert. denied, 559 U.S. 982 (2010). Moreover, courts accord wide-ranging deference to prison administrators who are acting to preserve discipline and security, whether confronting a violent inmate or planning preventive security measures. Whitley, 475 U.S. at 321-22; see Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990) (same), cert. denied, 498 U.S. 1103 (1991).

One of the means of force of which Goodwin complains is the use of pepper gas, which is actually the chemical agent, Sabre Red. The use of a chemical agent on a disruptive prisoner is

not per se unconstitutional.  Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008) ("Pepper spray is an accepted non-lethal means of controlling unruly inmates[,] . . . [and a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders."), overruled on other grounds as recognized by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010); Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The Supreme Court has never held, nor have we or any other court of appeals, so far as we can determine, that the use of tear gas or a chemical agent is a per se violation of the Eighth Amendment, whether an inmate is locked in his cell or not."), cert. denied, 470 U.S. 1085 (1985).  However, when chemical agents are used unnecessarily, without penological justification, or for the purpose of punishing or harming an inmate, the use is unconstitutional.  See Danley, 540 F. 3d at 1311 (holding that prolonged exposure to pepper spray due to a failure to properly decontaminate an inmate may form the basis of an Eighth Amendment violation); Iko v. Shreve, 535 F.3d 225, 239-40 (4th Cir. 2008) (finding an allegation of use of additional bursts of pepper spray after inmate attempted to comply sufficient to state an Eighth Amendment claim).  Compare Maddox v. Gibson, 2014 U.S. Dist. LEXIS 38252, at *28-29, 2014 WL 1202743, at *8-9 (S.D. Ala. Mar. 24, 2014) (lingering effects

after the use of pepper spray considered *de minimis* despite continued complaints when a subsequent exam showed no chemical side effects a month later) with Johnson v. Ashworth, 2014 U.S. Dist. LEXIS 41620, at *33, 2014 WL 1331019, at *10 (S.D. Ala. Mar. 27, 2014) (a genuine issue of material fact existed for the jury on the subject of *de minimis* injury where diagnosed acute iritis took two months to be resolved and where plaintiff suffered a loss of vision and later developed a cataract).

A prisoner may avoid summary judgment "only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain." Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987) (per curiam).

### 2. June 11, 2015 incident involving Defendant Madison.

Viewing the facts in the light most favorable to Plaintiff, he alleges that after being assaulted by five inmates, he was placed in protective custody on May 15, 2015. (Doc. 1 at 4).  He wrote several statements while in segregation mentioning that Defendant Madison was an associate of the inmates who assaulted him.  (Id.).  Then, on June 11, 2015, Madison, while escorting him from the HCU to his cell, kicked the back of his leg. (Id.).  Goodwin said something to Madison about kicking his leg.

(Id.).  Madison responded that he would "beat Petitioner[']s ass when they get on the elevator."  (Id. at 5).  Goodwin then requested to see the shift commander, and in response, Madison "tripped" Goodwin, straddled him, and choked him by digging his hands into his windpipe.  (Id.).

Officer Owens and Sergeant Fountain came upon them and saw Madison on top of Goodwin, choking him while his hands were cuffed behind his back.  (Id.).  They pulled Madison off Goodwin.  (Id.).  Goodwin was taken to the HCU, where he was treated for bruises around the neck and given a body chart. (Id.).

In response to Goodwin's allegations, Madison acknowledges that on the day in question, he was returning Goodwin from the HCU to Goodwin's Segregation Annex cell, which required the use of an elevator; however, he disputes that he kicked, threatened, or assaulted Goodwin.  (Doc. 44-2 at 1-2).  Madison relates that Goodwin stopped walking and said "he was not getting on the elevator and that he would spit in my face and beat my ass." (Id. at 1).  Madison maintains that he gave Goodwin several direct orders to board the elevator, and that instead, "Goodwin got silent and quickly charged in [his] direction."  (Id.). According to Madison, he grabbed Goodwin by his left arm and took him to the ground to gain control of him, and this resulted

31

in them ending up on the ramp a few steps from the elevator. (Id. at 1-2). Madison asserts that he gave loud verbal commands to Goodwin to stop resisting, that Goodwin complied, and he then ceased all force. (Id. at 2).

Madison states that he quickly called Sergeant Fountain to come to the Segregation Annex. (Id.). After Sergeant Fountain arrived, Fountain stood Goodwin up and escorted Goodwin to the HCU for a body chart. (Id.). Madison claims that he used only the amount of force necessary to stop Goodwin from resisting. (Id.).

> Officer Owens stated in his sworn affidavit that he
>
> observed inmate Sharone Goodwin being disruptive and combative towards [Defendant] Madison when Officer Madison was escorting inmate Goodwin to his assigned cell. Inmate Goodwin was brought into compliance and was escorted to the Health Care Unit where he was treated and released back to his assigned cell by Correctional Lieutenant Danny Fountain and [Officer Owens]. [Officer Owens] did not have to pull Officer Madison off inmate Goodwin at any time.

(Doc. 44-6 at 1). Fountain also submitted a sworn affidavit that substantially reiterates Owens's statements. (See Doc. 44-5 at 1).

The body chart reflects that Goodwin told medical personnel that he was assaulted. (Doc. 44-3). Medical personnel noted redness to Goodwin's right shoulder and the right side of his neck, small red areas on both arms, no acute distress or active

bleeding, and even and non-labored respiration. (Id.). It was also noted that Goodwin reported numbness in his left hand. (Id.).

In examining the evidence presented by the parties, the Court's core inquiry on an excessive force claim is "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Wilkins, 559 U.S. at 37 (quoting Hudson, 503 U.S. at 7). As noted *supra*, Eleventh Circuit has identified five factors to help evaluate whether force was applied maliciously or sadistically, namely:

> (1) the need for force; (2) the relationship between that need and the amount of force used; (3) the extent of the resulting injury; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible official on the basis of facts known to that official; and (5) any efforts made to temper the severity of the use of force.

Pearson v. Taylor, 665 F. App'x 858, 863 (11th Cir. 2016) (citations omitted).

As to the first and second factors, Madison contends that Goodwin disobeyed several orders, that Goodwin lunged at him, and that he took Goodwin to the ground in order to gain control of the situation. Goodwin, on the other hand, alleges that Madison kicked him from behind, that he asked to speak with another officer, and that in response, Madison tripped him from

33

behind, straddled him, and began choking him, even though his hands were handcuffed behind his back, until two other officers pulled Madison off of him.  Clearly, their conflicting versions create an issue of fact that must be resolved by a fact-finder, not the Court.

As to the third factor, the extent of the resulting injury, the Defendant contends that Goodwin did not suffer any injury as a result of the incident, and the medical record only noted redness to Goodwin's right shoulder, right side of his neck, and small red areas on both arms.  The body chart did not show that Goodwin had any injuries to his lower extremities from being kicked or tripped or that he complained of any such injuries to the medical personnel.  (Doc. 44-3).  Notwithstanding, Goodwin "does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."  Pearson, 665 F. App'x at 863 (citation and internal quotation marks omitted).  The inquiry is not the degree of injury, but why the force was applied.  In Hudson, the Supreme Court explained that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.  This is true whether or not significant injury is evident."  503 U.S. at 9 (internal citation omitted).

As to factors four and five, Madison alleges that Goodwin lunged at him, while Goodwin contends that Madison took him to the ground after he asked to see the shift commander and proceeded to choke him while his hands were handcuffed behind his back.  Here again, the conflicting versions of the facts create a jury question as to whether Goodwin posed a "threat to the safety of staff and inmates" and whether Madison tempered the severity of the use of force.

Applying these factors and resolving all issues of material fact in favor of Goodwin as the non-movant, the Court finds that a jury question is created with respect to whether excessive force was utilized with respect to the June 2015 incident. However, as will be explained in detail *infra*, this claim is nevertheless subject to dismissal pursuant to 42 U.S.C. § 1997e(e).

### 3. July 14, 2015 incident involving Defendant Ezell.

Goodwin alleges that on July 14, 2015, Defendant Brian Ezell sprayed his private parts and facial area with pepper gas, without provocation, while he was at his tray door.  (Doc. 1 at 6).  According to Goodwin, his tray door was then locked so he had no ventilation.  (Id. at 8).  Goodwin contends Ezell engaged in such conduct as a result of a statement he made against one of Ezell's co-workers, Defendant Madison.  (Id.).

35

In connection with a disciplinary hearing as a result of said incident, Goodwin gave a statement under penalty of perjury. In the statement, Goodwin alleged that he was attempting to tell Ezell that because he suffers from asthma, some officers leave his tray door open, so he can get fresh air. (Doc. 44-7 at 7). Goodwin asserted that on the day in question, officers left his tray drawer open after breakfast. (Id.). While attempting to explain this to Ezell, Ezell sprayed him without threat or provocation, then closed his tray door so he could not get any air. (Id.). A few inmates began kicking the door for help so Goodwin could get medical attention. (Id.).

In Ezell's affidavit, given under penalty of perjury, he states that as a segregation rover in the Segregation Annex on July 14, 2015, at approximately 10:00 a.m., he was conducting security checks and observed that Goodwin's tray door was open. (Doc. 44-8 at 2). He attempted to secure the tray door, but Goodwin stuck out his arm to prevent the door's closure. (Id.). Ezell ordered Goodwin several times to remove his arm, but he did not comply. (Id.). Ezell states that he then administered a one-second burst of Sabre Red to Goodwin's facial area. (Id.). Goodwin retreated to the back of his cell. (Id.). Ezell reported the incident to Sergeant Fountain, who took Goodwin to the HCU for a body chart and decontamination. (Id.;

Doc. 44-7 at 2). Ezell advises that his actions were taken to bring Goodwin under control and to gain cooperation, that he used "[t]he minimum amount of force . . . to get inmate Goodwin in compliance with [his] orders[,]" and that his actions were found to be reasonable according to the duty officer report, incident report, body chart, and use of force investigation report. (Docs. 44-7, 44-8 at 1-3).

The July 14, 2015 body chart reflects that Goodwin expressed to medical personnel that "[e]verything is on fire." (Doc. 44-7 at 4). It further reflects that Goodwin walked without assistance to the HCU where his eyes were flushed at the eye wash station. (Id.). No signs of distress were noted, and his breathing was even and non-labored. (Id.). He was instructed to return to the HCU in the evening. (Id.). On the body chart, there is no reference to Goodwin being sprayed in any area other than his face, or that any area other than his eyes had to be flushed. (See id.).

While Goodwin contends he did not provoke Ezell, he does not dispute that he did not obey Ezell's orders to remove his arm from his tray door so that Ezell could close the door. To gain Goodwin's compliance, Ezell deployed a one-second burst of pepper spray to his facial area. (Doc. 44-8). Goodwin does not dispute that a one-second burst was applied but contends that

his private parts were sprayed along with his face. However, Goodwin's claim regarding his private parts is contradicted by the body chart, and there are no medical records before the Court that support Goodwin's contention that his private parts were sprayed.

Examining the facts surrounding this incident according to the elements listed in <u>Pearson</u>, *supra*, a need for force arose when Goodwin refused to comply with Defendant Ezell's orders to enforce the security measure of closing his tray door. "[P]rison officers are authorized to use force when a prisoner repeatedly fails to obey an order." <u>Pearson</u>, 665 F. App'x at 864. And the use of pepper spray is recognized as

> "an accepted non-lethal means of controlling unruly inmates." It is designed to be disabling without causing permanent physical injury and is a reasonable alternative to escalating a physical confrontation. Therefore, "[a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders." A "short" burst is around five seconds or less.

<u>Id.</u> (citations omitted).

Thus, the use of a one-second burst of pepper spray was one of the least forceful and most proportionate ways to achieve compliance with Ezell's order to enforce the security measure. And, because the use of spray was limited to a one-second burst, Goodwin's injury from the pepper spray appears to have been temporary and minor. Indeed, Goodwin's eyes were flushed at the

38

HCU; however, no other injuries, including any breathing difficulties, were noted, even though Goodwin asserts, and the medical records show, that he has asthma.[7]   (Doc. 44-7 at 4). Moreover, he was told to return in the evening to the HCU. (Id.).   Accordingly, the evidence shows that by using a one-second burst of pepper spray to the face, Ezell tempered his response and eliminated the need for forceful physical contact as he sought to maintain prison security and have Goodwin comply with prison policy requiring the closing of the tray doors. Thus, the undersigned determines that Defendant Ezell's actions were a good faith effort to maintain discipline and security. As a consequence, Goodwin has not established the subjective element of an excessive force claim (that Defendant Ezell's actions were taken maliciously and sadistically for the very purpose of causing harm), and summary judgment is due to be granted to Defendant Ezell on this claim.[8]   See Pearson, 665 F. App'x at 863.

_____

[7]   The records reflect that Goodwin has asthma and was routinely prescribed breathing treatments three times a day (as needed) for his asthma.   (See Doc. 69-1 at 22 (on June 12, 2015, Proventil inhalation ordered three times a day for 90 days prn); id. at 23 (on May 23, 2015, Albuterol CFC free ordered three times a date for 180 days)).

[8]   As discussed infra, this claim is likewise subject to dismissal under 42 U.S.C. § 1997e(e).

**4. July 23, 2015 incident involving Defendant Ezell.**

In the complaint, Goodwin alleges that on July 23, 2015, Defendant Ezell came to his cell and sprayed him with pepper gas and locked the tray door, so he would receive no ventilation. (Doc. 1 at 8). He also suggests that it was because he made a statement against Madison, who he describes as Ezell's co-worker and friend.[9] (Id.). He further alleges that after Ezell sprayed him, Madison and Ezell, who both knew about his asthma, threatened to kill him. (Id. at 6). In his sworn affidavit, Ezell states that he was not present for this incident, that ADOC has no documentation of an incident on July 23, 2015, and he has no knowledge of any incident with Goodwin on July 23, 2015. (Doc. 44-8 at 1).

"[T]hreats and verbal abuse alone [are] insufficient to state a constitutional claim."). Hernandez v. Fla. Dep't of Corr., 281 F. App'x 862, 866 (11th Cir. 2008). And, as noted supra, when force is applied by prison officials, any Eighth Amendment inquiry must concentrate on whether the force was applied in a good faith effort to maintain discipline or was

---

[9]  Goodwin made the following statement against Defendant Ezell: "On July 14, 2015, August 14th, July 23rd 2015, and Sept 17th, 2015 each date Defendant came to petitioner['] cell and sprayed him with pepper gas then locking [the] door so he can['] get ventilation all because petitioner made a statement on Madison[,] his co-worker and friend. Then lied under oath." (Doc. 1 at 8).

carried out maliciously or sadistically for the purpose of causing harm. Wilkins, 559 U.S. at 37. While Goodwin makes a general allegation that Ezell came to his cell and sprayed him because he made a statement about Madison, he has not sufficiently developed this argument. Clearly, "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" is required. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Here, Goodwin has provided sparse facts. He asserts that Ezell sprayed him because of an unidentified statement he made about Madison at some unknown time. He has not, however, provided any information regarding what the statement was and when the statement was made, whether he was compliant at the time he was sprayed, whether the spray consisted of one burst or more, how long the tray door was closed, whether he was taken to the HCU for a medical review and decontamination, and whether any injuries were noted. In the absence of such facts, Goodwin has failed to establish an excessive force claim based on the alleged pepper-spraying incident of July 23, 2015. Moreover, as discussed in detail *infra,* the claim is also subject to dismissal based on 42 U.S.C. § 1997e(e).

**5. August 14, 2015 incident.**

Goodwin alleges that on August 14, 2015, while Defendants Ezell and Watson were delivering dinners to inmates, Defendant

41

Madison intentionally poured juice on his floor, and when he said something about it, Defendant Madison sprayed him with pepper gas knowing he has asthma. (Doc. 1 at 6, 8). Thereafter, Defendant Ezell closed the tray door so Goodwin could not get ventilation. (Id.). In another section of his complaint, Goodwin asserts that Ezell sprayed him on August 14, 2015 and on other dates. (Id. at 8).

Goodwin attached inmate Santonio Hicks' affidavit, signed under of penalty of perjury, to his response to the summary judgment motion. (Doc. 61 at 18). In the affidavit, inmate Hicks states that he was in a cell near Goodwin's cell when dinner was served on August 14, 2015. (Id.). According to inmate Hicks, he witnessed Defendants "Madison and Ezell . . . opening tray doors, while Madison was pouring juice[,] followed by Sgt. Fountain feeding and C/O Watson closing doors." (Id.). When Defendants Madison and Ezell were two doors from Goodwin's door, he observed them whispering. (Id.). When Defendant Madison came to Goodwin's door, he started pouring the juice inside the tray door on Goodwin's floor. (Id.). Goodwin said something about it to Defendant Madison, and Defendant Ezell came and sprayed pepper spray in Goodwin's face and cell. (Id.). Then, Defendant Madison sprayed Goodwin while Sergeant Fountain and Defendant Watson looked on laughing, even though

42

they knew he has asthma.  (Id.).  "[T]hey closed his tray door[,] so he couldn't get any air and walked away."  (Id.). Inmate Hicks further asserts that he and an inmate Morgan kicked and beat their doors to get the attention of Captain Fails who was with Warden Myers on the tier below giving haircuts.  (Id. at 18-19).  Captain Fails came and escorted Goodwin to the HCU. (Id.).

The body chart reflects that Goodwin told the nurse the "[s]ame officer who sprayed me on 6-11-15, sprayed me today." (Doc. 44-9 at 4).  The nurse recorded on Goodwin's body chart that no signs of distress or physical injuries were present, that his eyes were flushed out, and that no other needs were observed or voiced.  (Id.).

With respect to Goodwin's allegation, Defendant Ezell states in his affidavit that he was not present during the August 14, 2015 incident.  (Doc. 44-8 at 1).  Defendant Watson states that "[a]t no time did [he] witness any officer assaulting inmate Goodwin nor did [he] participate in any assaults on inmate Goodwin."  (Doc. 44-14 at 1-2).  Defendant Madison and Fountain do not address the August 14, 2015 incident in their affidavits.  (See Doc. 44-2 at 1-2; Doc. 44-5 at 1).

Viewing Defendants' and Goodwin's conflicting evidence in the light most favorable to Goodwin, the court must accept

43

Goodwin's version of these facts. According to Goodwin, during the meal distribution on August 14, 2015, Defendant Madison poured juice into his cell, and when he said something about it, Madison sprayed him, and then Defendant Ezell sprayed him and his cell and proceeded to close the tray door, so he could not get any ventilation. Given that Goodwin contends he was sprayed after he questioned Madison about pouring the juice on his floor, the Hudson/Whitley "need for the application of force" factor weighs in Goodwin's favor at this juncture. Accepting for purposes of summary judgment that there was no need to apply force to control Goodwin, the court must likewise conclude at this stage of the litigation that the other three Hudson/Whitley factors — the relationship between the need to apply force and the amount of force used, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of the response — also favor Goodwin. Based on Goodwin's contention that it was Defendants, as opposed to him, who provoked the situation, there was no need for the use of chemical agents, let alone use by two different officers. Thus, the use of the spray on him under the circumstances supports an inference that the use of force was a gratuitous, wanton infliction of pain, which constitutes a violation of the Eighth Amendment's prohibition on the use of excessive force. See

44

<u>Wilkins</u>, 559 U.S. at 37 (concluding that a gratuitous beating by prison guards, even without serious injuries, could violate a prisoner's Eighth Amendment rights). Goodwin's sworn testimony, if credited by a jury, establishes an Eighth Amendment violation. However, as discussed in detail *infra,* this claim is subject to dismissal based on 42 U.S.C. § 1997e(e).

## 6. September 17, 2015 incident involving Defendants.

Goodwin alleges that after coming off of his ten-day hunger strike, he was returned from the crisis cell to his assigned cell on September 16, 2015. (Doc. 1 at 6; Doc. 16 at 5). His personal property was missing, so Goodwin questioned Defendant Watson about it. (Doc. 1 at 6). The following day, Defendant Ezell was at his cell door discussing the missing items, when Defendant Madison appeared and started spraying pepper gas in his face. (<u>Id.</u> at 6-7). Ezell then proceeded to also spray Goodwin. (<u>Id.</u> at 7). Goodwin contends that Watson closed his arm in the tray door even though there was a sign from the warden stating that "no officer except a supervisor was to open [Goodwin's] tray door."[10]   (<u>Id.</u>).   Goodwin maintains that the

---

[10]   In his affidavit, Warden Terry Raybon asserted that he searched the records of Holman Correctional Facility pertaining to Goodwin but found "no memo or other record of any directive to staff stating that Inmate Goodwin's tray slot must only be opened in the presence of a supervisor." (Doc. 69-5 at 2). He did, however, find a memo dated May 15, 2015, from Warden Myers advising all security staff that Goodwin would be placed on Q-

sign's purpose was to stop the assaults against him.  (Id.).

In his affidavit, Defendant Ezell states:

On 9/17/15 I was assigned to Segregation. At
approximately 12:20 PM, I was assisting with feeding
inmates the noon meal. When I opened the tray door
for cell K1-63A to give Goodwin his food tray, Goodwin
stuck his arm out through the tray door to prevent me
from closing it. Goodwin stated, "You might as well
spray me because I'm not moving my arm." I gave
Goodwin a direct order to remove his arm from the tray
door which he refused to obey. Once again, I
retrieved my canister of Sabre Red and administered a
one (1) second burst to Goodwin's facial area.
Goodwin then slapped my hand, knocking my canister of
Sabre Red out of my hand to the floor, then placed his
other arm through the tray door as well. At this
point, Correctional Office[r] Antywon Madison
administered a one (1) second burst of Sabra Red to
Goodwin's facial area. Goodwin slapped Madison's hand
and then removed his arm from the tray door. Officer
Madison notified Correctional Officer Deveron Jackson
of the incident. Correctional Officers Jeremy Watson
and Tony Lett escorted Goodwin to the health care unit
for a body chart and decontamination.

(Doc. 44-8 at 2-3). Defendant Madison's affidavit does not

address the September 17, 2015 incident, while Defendant

Watson's affidavit states generally that "[a]t no time did [he]

witness any officer assaulting inmate Goodwin nor did [he]

participate in any assaults on inmate Goodwin." (See Doc. 44-2;

Doc. 44-14 at 1-2).

The body chart prepared following the incident reflects as

follows: a bruise/abrasion to Goodwin's right wrist and forearm

_____

side, that no other inmates were to be placed on Q-side, and
that a supervisor must be present whenever Goodwin is escorted
to the showers. (Id. at 1).

and a bruise to the left forearm with a knot observed on the left hand. (Doc. 44-11). There is no indication that any medical treatment was required or that there were any lingering effects.

Viewing Defendants' and Goodwin's conflicting evidence in the light most favorable to Goodwin, the court must accept Goodwin's version of these facts. According to Goodwin, while he was talking with Ezell at his cell door about his missing personal property, Madison appeared and sprayed him, and then Ezell sprayed him, while Watson closed the tray door on his arm. Given that Goodwin contends he was sprayed after he asked about his missing personal property, the Hudson/Whitley "need for the application of force" factor weighs in Goodwin's favor at this juncture. Accepting for purposes of summary judgment that there was no need to apply force to control Goodwin, the court must likewise conclude at this stage of the litigation that the other three Hudson/Whitley factors — the relationship between the need to apply force and the amount of force used, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of the response — also favor Goodwin. Goodwin's version of the facts creates the inference that it was Defendants, as opposed to him, who provoked the situation, and that there was no need for the use of chemical agents, let alone

use by two different officers.  Thus, the use of the spray on Goodwin under the circumstances supports an inference that the use of force was a gratuitous, wanton infliction of pain, which constitutes a violation of the Eighth Amendment's prohibition on the use of excessive force.  However, as discussed in detail below, the claim is subject to dismissal based on 42 U.S.C. § 1997e(e).

**D.  Limitation on Recovery.**

Goodwin seeks compensatory and punitive damages for physical and emotional injuries he suffered as a result of Defendants' conduct.  (Doc. 1 at 11).  Defendants argue that, pursuant to 42 U.S.C. § 1997e(e), Goodwin may not recover compensatory or punitive damages because, at most, his physical injuries were *de minimis* in nature.  42 U.S.C. § 1997e(e), which is entitled "Limitation on recovery," provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury. . . ."  42 U.S.C § 1997e(e).

Section 1997e(e) was enacted by Congress "[i]n an effort to stem the flood of prisoner lawsuits in federal court[.]"  Harris v. Garner, 216 F.3d 970, 972 (11th Cir. 2000), cert. denied, 532 U.S. 1065 (2001).  By enacting this section, Congress chose to

"preclude[] some actions for money damages[,]" Harris v. Garner,
190 F.3d 1279, 1283 (11th Cir. 1999), opinion vacated by 197
F.3d 1059, opinion reinstated in part by 216 F.3d 970 (11th Cir.
2000), and "to enforce prisoners' constitutional rights through
suits for declaratory and injunctive relief[,]" id. at 1289, and
nominal damages, Brooks v. Warden, 800 F.3d 1295, 1307-09 (11th
Cir. 2015).   Section 1997e(e) applies "only to lawsuits
involving (1) Federal civil actions (2) brought by a prisoner
(3) for mental or emotional injury (4) suffered while in
custody."   Napier v. Preslicka, 314 F.3d 528, 532 (11th Cir.
2002), cert. denied, 540 U.S. 1112 (2004).   The mental or
emotional injury does not need to be pled in order for the
statute to be applicable.   Al-Amin v. Smith, 637 F.3d 1192, 1197
& n.5 (11th Cir. 2011) (stating that a contrary holding would
give talismanic importance to a prisoner's pleading or not
pleading of mental or emotional injury and lead to illogical
results).   Thus, in order to avoid dismissal of claims for
compensatory and punitive damages under § 1997e(e), a prisoner's
claim "must be accompanied by allegations of physical injuries
that are greater than de minimis."   Mitchell v. Brown &
Williamson Tobacco Corp., 294 F.3d 1309, 1312-13 (11th Cir.
2002).

    In this action, Goodwin requested $10,000 in punitive

damages and $10,000 in compensatory damages from each Defendant
for his pain and suffering and mental anguish, and a declaratory
judgment for violations of the Eighth and Fourteenth Amendments.
(Doc. 1 at 11).  Because Goodwin does not identify a specific
physical injury that he suffered, much less an injury that is
greater than *de minimis*, this action comes within the scope of
42 U.S.C. § 1997e(e), which requires that in order to recover
compensatory and punitive damages a prisoner must have sustained
a physical injury that is greater than *de minimis*.  Cf. Siglar
v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997) (finding a sore,
bruised ear which lasted for three days was *de minimis*); Quinlan
v. Pers. Transp. Servs. Co., LLC, 329 F. App'x 246, 249 (11th
Cir. 2009) (finding an asthmatic prisoner's claims for
compensatory and punitive damages for "temporary chest pain,
headache, and difficulty breathing" due to a smoky smell in the
transportation van did not show that an injury greater than *de
minimis* was suffered); Thompson v. Quinn, 2013 WL 2151715, at
*12 (N.D. Fla. May 16, 2013) (finding that an inmate's claims
for his body's burning sensation after he was sprayed with a
chemical agent was not an injury greater than *de minimis*,
inasmuch as after being rinsed off, he presented with no
injuries requiring treatment, voiced no complaints in the
medical examination, and did not use sick call for later

50

developing problems); Robinson v. Tift, 2012 U.S. Dist. LEXIS
93452, at *5-6, 2012 WL 2675467, at *2 (N.D. Fla. June 1, 2012)
(finding that chemical spray did not cause a physical injury
that was greater than *de minimis* when plaintiff's eyes
involuntarily closed, had a burning sensation, and sustained a
temporary loss of vision); Kornagay v. Burt, 2011 U.S. Dist.
LEXIS 23522, at *55, 2011 WL 839496, at *18 (N.D. Fla. Feb. 8,
2011) (finding the evidence did not show the plaintiff suffered
an injury greater than *de minimis* after being sprayed with a
chemical agent); Jennings v. Mitchell, 93 F. App'x 723, 725 (6th
Cir. 2004) (finding that the inmate failed to allege more than
*de minimis* injury from being sprayed with pepper spray after
repeatedly disobeying a direct order, as "he merely was
uncomfortable in the ordinary fashion of persons exposed to
pepper spray" and was at no time in respiratory distress); see
generally Porter v. Shumake, 2016 U.S. Dist. LEXIS 93388, at
*44-46, 2016 WL 3923421, at *13 (S.D. Ga. June 24, 2016)
(listing cases where courts found that "the typical effects
associated with pepper spray" did "not satisfy Section
1997e(e)'s physical injury requirement"), report and
recommendation adopted, 2016 U.S. Dist. LEXIS 93096, 2016 WL
3926439 (S.D. Ga. July 18, 2016).

A careful review of Goodwin's numerous allegations does not

convey that he suffered a physical injury that is greater than
*de minimis*.   Indeed, the body charts clearly reflect that
Goodwin's injuries were *de minimis* at best.   For instance,
Goodwin has not produced anything to dispute Defendant Ezell's
sworn testimony that the use of a chemical agent was limited to
single one-second bursts, and Goodwin was taken to the HCU for
decontamination.   And while Goodwin contends and the medical
records confirm that he suffers from asthma, Goodwin does not
allege, and the record does not reflect, that he suffered any
lingering effects from the bursts of chemical agent.[11]   Moreover,
the bruise/abrasion to Goodwin's right wrist and forearm and the
bruise to his left forearm with a knot, which were noted
following the September 17, 2015 incident, were *de minimis*
injuries that did not require medical treatment and apparently
resolved on their own, as Goodwin did not allege any
complications.   See Tate v. Rockford, 497 F. App'x 921, 925
(11th Cir. 2012) (finding the inmate's "laceration on his
forehead, several small abrasions and cuts, and a swollen right
eye" to be *de minimis*), cert. denied, 569 U.S. 931 (2013);
Oliver v. Gafford, 2018 U.S. Dist. LEXIS 69599, at *33-34, 2018

---

[11]   As noted, the medical records reflect that Goodwin was
routinely prescribed breathing treatments as needed for his
asthma; however, the records do not document any breathing
difficulties in connection with any of the incidents alleged in
the complaint.   (See Doc. 69-1).

WL 1938308, at *13 (N.D. Fla. Jan. 19, 2018) (finding that slight swelling to the thumb which required no medical attention was *de minimis*), report and recommendation adopted, 2018 U.S. Dist. LEXIS 68622, 2018 WL 1937072 (N.D. Fla. Apr. 24, 2018); Hollingsworth v. Thomas, 2014 U.S. Dist. LEXIS 73556, at *10-11, 2014 WL 2435763, at *4 (S.D. Ala. May 30, 2014) (finding the inmate had a *de minimis* injury from being struck twice on his hand and fingers with an extendable riot baton that caused him to receive pain medication and to have his wrist wrapped); Siglar, 112 F.3d at 193 (finding that a sore, bruised ear which lasted for three days was a *de minimis* injury). Because Goodwin did not suffer a physical injury, or at least one greater than *de minimis,* his claims for compensatory and punitive damages against Defendants arising out of the incidents set forth in the complaint are due to be dismissed without prejudice pursuant to 42 U.S.C. § 1997e(e) for failure to state a claim upon which relief can be granted. See Harris, 216 F.3d at 980 ("[D]ismissal under this statutory provision of a claim that is filed during confinement should be without prejudice to re-filing the claim if and when the plaintiff is released.").

Additionally, nominal damages are not recoverable on Goodwin's claims because he specifically requested compensatory and punitive damages in amounts of $10,000, which are not

nominal amounts and cannot be logically construed as seeking nominal damages. Qualls v. Santa Rosa Cnty. Jail, 2010 U.S. Dist. LEXIS 19469, at *8 n.1, 2010 WL 785646, at *3 n.1 (N.D. Fla. Mar. 4, 2010) (dismissing the plaintiff's complaint, as it "cannot be liberally construed as requesting nominal damages, because he specifically requests only $250,000 in compensatory and/or punitive damages"); Ringgold v. Fed. Bureau of Prisons, 2007 U.S. Dist. LEXIS 75326, at *14-15 & n.5 2007 WL 2990690, at *5 & n.5 (D.N.J. Oct. 5, 2007) (dismissing the complaint under § 1997e(e) because the alleged injury was de minimis and the plaintiff sought "compensatory damages 'in an amount not less than $2,000,000' . . . and expresse[d] no interest in nominal damages"); cf. Carey v. Piphus, 435 U.S. 247, 266-67 (1978) (holding nominal damages should not exceed one dollar); Kyle v. Patterson, 196 F.3d 695, 697 (7th Cir. 1999) ("[N]ominal damages, of which $1 is the norm, are an appropriate means of vindicating rights whose deprivation has not caused actual, provable injury."); Harrison v. Myers, 2011 U.S. Dist. LEXIS 82738, at *20, 2011 WL 3204372, at *7 (S.D. Ala. July 13, 2011) (finding the prisoner's request of $2,500 was not for nominal damages, as nominal damages are defined as a mere token or trifling).

**E.   Request for Declaratory Judgment.**

In addition to his compensatory and punitive damages claims, Goodwin requests a declaratory judgment.  A remedy for declaratory relief is created by 28 U.S.C. § 2201(a), which provides that "[i]n a case of actual controversy . . . any court of the United States, . . . may declare the rights and other legal relations of any interested party seeking such declaration[.]"  28 U.S.C. § 2201(a).  "Declaratory relief is by its nature prospective."  McGee v. Solicitor Gen. for Richmond Cnty., Ga., 727 F.3d 1322, 1325 (11th Cir. 2013).  That is, it is "[i]n contrast . . . [to] a claim for money damages [that] looks back in time and is intended to redress a past injury."  Adler v. Duval Cnty. Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997).  Thus, to have standing to seek declaratory relief, a plaintiff "'must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.'"  Koziara v. City of Casselberry, 392 F.3d 1302, 1305 (11th Cir. 2004) (quoting Johnson v. Bd. of Regents, 263 F.3d 1234, 1265 (11th Cir. 2001)).  "[T]he continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury."  Emory v. Peeler, 756 F.2d 1547, 1552 (11th Cir. 1985).  A remote possibility of a future injury occurring

55

is not adequate to meet the "actual controversy" requirement for declaratory relief.  Id.  The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred.  Ciudadanos Unidos de San Juan v. Hidalgo Cnty. Grand Jury Comm'rs, 622 F.2d 807, 821-22 (5th Cir. 1980), cert. denied, 450 U.S. 964 (1981).[12]

Goodwin has not made a specific showing of any likelihood of being subjected to unlawful conduct by a named Defendant in the future.  Because Goodwin is now located at Bibb Correctional Facility (see Doc. 80) and away from Holman, where Defendants were employed and where some are possibly still located, Goodwin will be unable to make the required showing that he will be subject to unlawful conduct in the future by the named Defendants.  See City of Los Angeles v. Lyons, 461 U.S. 95, 104 (1983) (merely asserting that one may again be subject to unlawful conduct does not generally give rise to standing to demand prospective relief); Chambers v. Wright, 2014 U.S. Dist. LEXIS 77940, at *2-3, *5-6, *10, 2014 WL 2590937, at *1-2, *4 (N.D. Ala. June 9, 2014) (dismissing without prejudice declaratory and injunctive relief claims based on excessive force claims, which included being sprayed with a pepper-type

---

[12]   The Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as binding precedent the decisions of the former Fifth Circuit handed down before October 1, 1981.

56

spray, that arose at the jail, because plaintiff had been transferred or released from the jail). Thus, Goodwin's claim for declaratory relief fails "to satisfy the threshold 'case or controversy' requirement of article III and the 'actual controversy' prerequisite of 28 U.S.C. § 2201" and, therefore, is subject to dismissal. See Emory, 756 F.2d at 1552.

IV.   **CONCLUSION**.

Based upon the foregoing reasons, the undersigned recommends that Defendants' summary judgment motion be **GRANTED**. More specifically, it is recommended that Goodwin's claims based on the disciplinary proceedings and deprivation of property be dismissed with prejudice, his claims based on the use of excessive force on July 14, 2015 and July 23, 2015 be dismissed with prejudice, and his claims based on the use of excessive force on June 11, 2015, August 14, 2015, and September 17, 2015 be dismissed without prejudice. Thus, it is further recommended that this action be **DISMISSED** in its entirety.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. Gen.LR 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."  11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **27th** day of **March, 2019.**

                             **/s/SONJA F. BIVINS**
                         **UNITED STATES MAGISTRATE JUDGE**